483 S.E.2d 477

**Colin BROWN, Tanya Brown, Jeannie Crittenden, Richard Crittenden and Nancy Bryson (fka Nancy Sinnott), Appellants,**

v.

**John C. PEARSON and South Carolina Conference of the United Methodist Church, Respondents.**

No. 2643.

Court of Appeals of South Carolina.

Heard Nov. 6, 1996.

Decided March 10, 1997.

Susan Ingles; Roy F. Harmon, III, and Julie M. Bondura, Greenville, for appellants.

Edward R. Cole, of The Ward Law Firm, Spartanburg, for respondents.

PER CURIAM:

Church members Colin Brown, Tanya Brown, Jeannie Crittenden, Richard Crittenden, and Nancy Bryson brought this action against the South Carolina Conference of the United Methodist Church ("the Conference") and its district superintendent, John C. Pearson, for claims arising out of alleged sexual harassment and abuse perpetrated by a pastor. The trial judge granted summary judgment for the defendants and the church members appeal. We affirm.

## FACTS

Viewing the evidence in the light most favorable to Appellants, the record reveals the following. Appellants Tanya Brown, Jeannie Crittenden, and Nancy Bryson ("Female Appellants") alleged Reverend Jerry Brunson sexually harassed and abused them while he was minister of Lee Road United Methodist Church ("the Church"), a member church of Respondent Conference, over a period of months in 1989 and 1990.[1] Appellants Richard Crittenden and Colin Brown are married to Jeannie Crittenden and Tanya Brown, respectively.

Respondent John Pearson, district superintendent of the Conference, learned of the allegations in the summer of 1990. As a result of these allegations, Female Appellants were asked to appear before the Lee Road Staff Parish Relations Committee ("the Committee") on August 2, 1990. Each complainant was required to voice her allegations at this meeting, which Brunson attended. The complainants were not allowed to

---

1. Female Appellants' civil action against Brunson was barred by the statute of limitations.

hear Brunson's responses, nor were they allowed to hear the other complainants' statements.

After hearing the accusations against Brunson, the Committee gave Brunson a vote of "no confidence" and decided it had to forward the charges to the Church for a joint review of Brunson's conduct. Brunson then requested six weeks' paid vacation followed by a leave of absence, and the Committee granted his request.

Brunson spoke to the Church congregation the following Sunday, August 5, 1990, and explained he was taking a paid vacation. Brunson had telephoned members of the congregation to gain support in response to Appellants' charges. Furthermore, the tone of Brunson's voice, as he spoke to the congregation, made it appear that he had been falsely charged. No one from the Conference hierarchy attended the service.

Pearson visited the Church the following two Sundays to explain Brunson's leave of absence. Pearson told the congregation allegations had been made but did not reveal the true nature of the complaints or that any investigation was being conducted.

Before the charges against him were reviewed, Brunson resigned from the Conference. The Conference accepted Brunson's resignation as a "withdrawal under complaint or charges." Upon Brunson's resignation, the Conference discontinued its investigation into Female Appellants' allegations. Pearson knew of Brunson's resignation before his second visit to the Church, but failed to publicly disclose that Brunson had resigned under complaint.

Shortly thereafter, the Conference provided each victim with $400 for counseling. Pearson referred Tanya Brown, the only victim who had requested counseling, to a Methodist pastoral counselor, but Brown saw him only twice because she believed he was unprofessional and unresponsive to her needs. Brown did not request further counseling from Pearson until the fall of 1992 because she believed additional funds were unavailable.

Appellant Richard Crittenden wrote Pearson and Bishop Joseph Bethea a letter in September 1990 in which he shared

his concerns relating to the Brunson incident and its impact on him and his wife. He also made suggestions to improve the Conference's method of investigation. Bishop Bethea stated in his response that he would keep in touch with Pearson and the Crittendens and that Richard Crittenden's suggestions would be given serious consideration.

Reverend Tom Pietila became the Church's pastor in January of 1991. Approximately one year later, Appellants approached Pietila and requested help in resolving the Brunson situation. Pietila subsequently informed Pearson Appellants were still experiencing problems.

Pearson requested $4,000 from the Conference, and in October 1992 the Conference approved the expenditure for training for pastors in handling sex abuse allegations and for Female Appellants to attend a Survivors of Clergy Sexual Abuse retreat. Pearson notified Female Appellants of the approved funding and of the Conference's development of a sexual ethics policy. The sexual harassment training began in November 1992.

Jeannie Crittenden and Tanya Brown attended the sexual abuse retreat in March 1993. The Conference gave the unused balance of the money allotted for the retreat to Crittenden to help pay her individual counseling expenses.

On November 17, 1992, Appellants met with Bishop Bethea to discuss their disappointment with the Conference and Pearson's handling of the Brunson situation. Appellants complained the Conference was not following through on its responsibilities to them. Colin Brown told the Bishop they did not want to bring a lawsuit against the church but wanted the situation resolved. Bishop Bethea assured Appellants someone in the Church would write a letter to the Church congregation explaining what really happened between Brunson and Female Appellants. He also assured them they would have input in the establishment of the sexual ethics policy that was to be presented at the 1993 Annual Conference. At this meeting, the Bishop gave Appellants a copy of the proposed sexual ethics policy and asked for their comments. Appellants told the Bishop the proposed policy was a start but had a long way to go. Nevertheless, that policy was adopted at the June 1993 Annual Conference. No one ever wrote the letter to the

congregation explaining what actually happened between Brunson and Female Appellants.[2]

On July 30, 1993, Appellants filed this lawsuit alleging negligence, gross negligence, invasion of privacy, breach of fiduciary duty, negligent infliction of emotional distress, intentional infliction of emotional distress, fraud, and clergy malpractice. As a result of discovery, Appellants learned ministers in the Conference knew Brunson had previously acted inappropriately toward women while ministering at another church but "swept it under the rug."

Claiming the limitations period had expired, Respondents moved for summary judgment. By order dated July 5, 1994, the Honorable Charles B. Simmons denied the motion, determining that a jury should decide whether Respondents' actions should estop them from relying on the statute of limitations. After the parties had conducted further discovery, the Honorable L. Henry McKellar reopened the statute of limitations issue, and by order dated March 8, 1995, granted summary judgment to Respondents. He determined that the limitations period had expired on Appellants' negligent hiring and supervision claims and that the record revealed no actionable conduct by the Respondents in relation to Appellants' other substantive claims.

## LAW/DISCUSSION

Appellants contend the trial judge erred when he granted summary judgment to Respondents based on the statute of limitations when a previous judge determined a jury should decide whether the limitations period bars the action. We disagree.

## SUMMARY JUDGMENT

A denial of a motion for summary judgment does not establish the law of the case, and the issues raised in the motion may be raised later in the proceedings by a motion to

---

2. A few days after this meeting, Bethea was stabbed and his injury required several months' recuperation. After the Bishop resumed work, he informed Tanya Brown by letter dated March 25, 1993, that her experience at the Church service was still a "burning issue."

reconsider the summary judgment motion or by a motion for a directed verdict. *Ballenger v. Bowen,* 313 S.C. 476, 443 S.E.2d 379 (1994); *see also Lindsey v. Dayton–Hudson Corp.,* 592 F.2d 1118, 1121 (10th Cir.), *cert. denied,* 444 U.S. 856, 100 S.Ct. 116, 62 L.Ed.2d 75 (1979) ("We see no merit in the contentions that summary judgment was improper because ... an earlier motion for summary judgment, which raised the same issues, had been denied."); 21 C.J.S. *Courts* § 149 at 183 (1990) (a grant of summary judgment is not precluded by a prior denial of a motion for summary judgment). The decision whether to reconsider a motion for summary judgment is within the trial judge's discretion. *PPG Indus., Inc. v. Orangeburg Paint & Decorating Ctr., Inc.,* 297 S.C. 176, 375 S.E.2d 331 (Ct.App.1988).

■ Here, Judge McKellar asked if there had been additional discovery since Judge Simmons's order that "would allow us to get to the bottom of this question[.]" Respondents stated there had been, and Appellants did not indicate otherwise. Appellants acknowledged in a motion filed with the court in connection with defendants' motion for summary judgment that "substantial discovery has been conducted since that time by the defendants." We therefore find Judge McKellar did not abuse his discretion by considering the renewed motion.

■ Appellants also assert the judge erred in granting summary judgment because Respondents' motion failed to provide notice that the statute of limitations issue would be reargued. We disagree.

■ An error not shown to be prejudicial does not constitute grounds for reversal. *JKT Co. v. Hardwick,* 274 S.C. 413, 265 S.E.2d 510 (1980). In response to Appellants' initial objection that they had no notice the statute of limitations issue would be reargued, the trial judge gave Appellants four days to submit cases supporting their argument, and Appellants did not complain the time would be insufficient. Accordingly, Appellants have failed to show they were prejudiced by the judge's ruling.

■ Appellants also contend even if the trial judge did not err in reopening the issue, he erred in finding the claims of

negligent hiring and supervision barred by the limitations period. Appellants urge the limitations period for the negligent hiring and supervision claims did not begin to run when they knew they were injured but began when they knew the Conference and Pearson had injured them. We disagree.

Summary judgment is appropriate where it is clear there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Kreutner v. David,* 320 S.C. 283, 465 S.E.2d 88 (1995). In determining whether summary judgment is proper, the court must construe all inferences arising from the evidence against the moving party. *Calvert v. House Beautiful Paint and Decorating Ctr., Inc.,* 313 S.C. 494, 443 S.E.2d 398 (1994).

A negligence action arising or accruing on or after April 5, 1988, must be commenced within three years "after the person knew or by the exercise of reasonable diligence should have known that he had a cause of action," S.C.Code Ann. § 15-3-535 (Supp.1996), not three years after a full-blown theory of recovery has been developed. *Christensen v. Mikell,* 324 S.C. 70, 476 S.E.2d 692 (1996). "The exercise of reasonable diligence" means that an injured party must act promptly "where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist." *Wiggins v. Edwards,* 314 S.C. 126, 128, 442 S.E.2d 169, 170 (1994) (quoting *Snell v. Columbia Gun Exchange,* 276 S.C. 301, 303, 278 S.E.2d 333, 334 (1981)). Furthermore, in determining when the limitations period begins to run, the proper focus is upon the date of discovery of the injury, not the date of the discovery of the wrongdoer. *Wiggins,* 314 S.C. 126, 442 S.E.2d 169.

Appellants do not dispute they became aware of their injuries more than three years before bringing the present action. Therefore, even though Appellants did not know the exact nature of the wrong at that time, they knew their rights had been invaded. The trial judge was therefore correct in his ruling concerning when the statute of limitations began to

run on the causes of action alleging negligent supervision and negligent hiring.[3]

Furthermore, we agree with the trial judge Appellants have failed to demonstrate any evidence of conduct by Respondents that should estop them from relying on the statute of limitations.

A defendant may be estopped from asserting the statute of limitations as a defense if his conduct has induced the plaintiff into believing a lawsuit is unnecessary. *Vines v. Self Memorial Hosp.*, 314 S.C. 305, 443 S.E.2d 909 (1994). An intentional misrepresentation by the defendant is not necessary. *Dillon County Sch. Dist. Number Two v. Lewis Sheet Metal Works, Inc.*, 286 S.C. 207, 332 S.E.2d 555 (Ct.App.1985). An aggrieved party's reasonable reliance on the words or conduct of the party being estopped is sufficient. *Id.* Whether estoppel bars the defendant from relying on the statute of limitations is generally a question for the jury. *Vines*, 314 S.C. 305, 443 S.E.2d 909. However, summary judgment is proper if the record fails to reveal any conduct on the part of the defendant warranting estoppel. *Id.*

Appellants contend the trial judge erred when he granted summary judgment as to the substantive elements of all of their causes of action other than the negligent supervision and negligent hiring claims. We disagree.[4]

We now address those causes of action seriatim.

## NEGLIGENCE

Appellants alleged Respondents were negligent and/or grossly negligent in their responses to Appellants' complaints.

Initially, we note the trial court held Appellants needed to prove reckless, wilful, or grossly negligent conduct by Pearson in order to recover against him individually as an

---

3. The trial judge concluded the limitations period for claims began to run as follows: Nancy Bryson (August 1989), Tanya Brown (October 1989), Jeannie Crittenden (February 1990).

4. Because we affirm on this ground, we do not address the question of whether Appellants' claims were time barred.

employee of a charitable organization,[5] and the record disclosed no such conduct whatsoever on his part. Because Appellants have not challenged that ruling, it is now the law of the case. *Resolution Trust Corp. v. Eagle Lake & Golf Condominiums*, 310 S.C. 473, 427 S.E.2d 646 (1993) (an unchallenged ruling by the trial court is the law of the case). Moreover, we agree with the trial court's analysis.

The trial court further held no cause of action for clergy malpractice exists in South Carolina. On appeal, Appellants have cited no precedent and we are aware of none that stands for the proposition a church owes its parishioners a duty of care regarding its handling of their complaints.[6] The trial court was therefore correct to grant summary judgment against Appellants on their negligence cause of action.

## INVASION OF PRIVACY

■■■ Appellants conceded to the trial court this cause of action is confined to a theory of either "publication of private affairs of no legitimate public concern" or one of "false light." In *Snakenberg v. Hartford Casualty Ins. Co.*, 299 S.C. 164, 170–71, 383 S.E.2d 2, 6 (Ct.App.1989), this court defined "wrongful publication," the first of Appellants' invasion of privacy theories, as follows:

Wrongful publicizing of private affairs involves a public disclosure of private facts about the plaintiff. The gravamen of the tort is publicity as opposed to mere publication. The defendant must intentionally disclose facts in which there is no legitimate public interest—there is no right of privacy in public matters. Additionally, the disclosure must be such as would be highly offensive and likely to cause serious mental injury to a person of ordinary sensibilities.

---

5. *See* S.C.Code Ann. § 33–55–210(A) (1976), *repealed by* 1994 Act No. 461, § 3, effective June 29, 1994.

6. In their brief, Appellants make only the conclusory statement, "It is clear that the Defendants had a duty to prevent the sexual harassment of its parishioners by a member of the clergy and to help in healing afterward rather than being 'indifferent.'" Appellants argue the Church's standard of care would be "to take initiative toward the victims and the congregation to do whatever is needed to promote healing and this must be a continuing response."

The facts upon which Appellants rely in asserting this cause of action are as follows. The Crittendens and the Browns, after reporting their complaints regarding Brunson, were allegedly required by Reverend Pearson as District Superintendent to appear before the Committee on August 2, 1990. The purpose of this appearance was to provide a forum for Female Appellants to present their charges against Brunson. Brunson was present at the meeting, along with his counselor. Appellants next contend Pearson acquiesced in the Committee's decision to allow Brunson to make some final remarks to the congregation at the regular Sunday service of the church on August 5, 1990. Appellants claim Brunson's remarks made it appear he was being falsely accused, but have provided no evidence substantiating this naked assertion.

Appellants further allege that Reverend Pearson and the Conference should not have "acquiesced" in the decision of the Committee to permit Brunson to go on paid vacation after the August 5, 1990, service because this somehow further implied Appellants' charges were groundless. Finally, Appellants contend Reverend Pearson and the Conference should have publicized to the congregation at large the circumstances of Brunson's resignation of his Methodist credentials in mid-August, 1990. These asserted errors or omissions by the Conference and Reverend Pearson allegedly amounted to wrongful publication of Appellants' private affairs or had the result of wrongfully placing the Appellants in a "false light."

The facts upon which Appellants rely do not as a matter of law constitute invasion of privacy. First, the only "publicizing" of facts concerning the Appellants was done by the Appellants themselves. Appellants communicated their complaints to a small committee of the local church. There is no evidence that either of the Respondents "publicized" Appellants' complaints other than within the official channels of the local church and Conference and to those charged with dealing with such allegations. Further, insofar as Brunson was the pastor of the Church, allegations of his sexual misconduct were certainly matters of some notoriety within the Church community.

As to the third element of this particular branch of invasion of privacy, the facts disclosed were of some legitimate public

interest, albeit to a limited group. Appellants made their disclosures expecting and intending that both the Committee and Respondents would act on those complaints. Appellants therefore intended that their complaints should become public to the limited extent that occurred under these circumstances. Respondents' actions were nothing more than an attempt to further the legitimate interests of all parties involved, including Appellants.

▆▆ As to Appellants' claim of "false light," no South Carolina case has recognized this tort. F. Patrick Hubbard & Robert L. Felix, *The South Carolina Law of Torts* 453 (1990). Even if this court recognized the existence of that cause of action as a branch of invasion of privacy, however, nothing in the conduct of Respondents gives rise to such a claim under these circumstances. *See id.* at 452.

## BREACH OF FIDUCIARY DUTY

▆▆ Appellants claim a fiduciary relationship with the Conference in general and with Reverend Pearson in particular. They allege both Respondents breached duties owed them arising from this relationship. This court finds as a matter of law no fiduciary duty existed between the Respondents and the Appellants under these circumstances. Even if such duty could be said to exist, there is no evidence of a breach of that duty. There is no evidence that Respondents acted other than in good faith and with due regard to Appellants' interests.

No South Carolina authority exists specifically holding a fiduciary relationship exists between a clergyman and a parishioner. In general, however, the South Carolina courts have stated as follows:

A confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one imposing the confidence.

Courts of equity have carefully refrained from defining the particular instances of fiduciary relationship in such a manner that other and perhaps new cases might be exclud-

ed and have refused to set any bounds to the circumstances out of which a fiduciary relationship may spring.

*Island Car Wash, Inc. v. Norris,* 292 S.C. 595, 599, 358 S.E.2d 150, 152 (Ct.App.1987) (citations omitted); Hubbard & Felix, *supra,* at 47–48. "[A]s a general rule, a fiduciary relationship cannot be established by the unilateral action of one party. The other party must have actually accepted or induced the confidence placed in him." *Steele v. Victory Sav. Bank,* 295 S.C. 290, 295, 368 S.E.2d 91, 94 (Ct.App.1988).

As is stated in *Moses v. Diocese of Colorado,* 863 P.2d 310, 322 (Colo.1993), *cert. denied,* 511 U.S. 1137, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994), "[t]he clergy-parishioner relationship is not necessarily a fiduciary relationship." The cases in other states in which this relationship has been found to exist involve, for example, self-dealing or self-interest on the part of the clergyman involved, such as abuse by a clergyman of his role as a counselor, *e.g., Destefano v. Grabrian,* 763 P.2d 275 (Colo.1988), or a clergyman enhancing his own financial position at the expense of a parishioner, *e.g., Adams v. Moore,* 96 N.C.App. 359, 385 S.E.2d 799 (1989). No such situation is present in the case at bar.

■ Here, the record establishes that only one of the Appellants, Nancy Sinnott, ever went to see Reverend Pearson in person to make her complaints about Brunson. The other female Appellants took their complaints not to Reverend Pearson but to the chairman of the Committee. Although Reverend Pearson was the superintendent of the Conference district in which Appellants' church was located, and in that position was the direct and indirect recipient of Appellants' charges, his mere occupation of the position of superintendent did not create a fiduciary relationship with these Appellants.

■ Neither did the mere expectation on the part of Appellants that Reverend Pearson and the Conference would take action on their complaints create any such relationship. The steps taken unilaterally by the Appellants do not constitute an attempt on their part to establish the relationship alleged, and there is no evidence that Respondents accepted or induced any special, fiduciary bond with any of the Appellants under these facts in any event. The facts establish that Respondents never occupied a position in this matter in which

they purported to act *only* in Appellants' interests. Rather, Respondents' obvious intentions and obligations were to take into account the positions on both sides of the issues involved. Appellants proof fails as a matter of law to create a question for jury decision as to the existence of the fiduciary relationship alleged by the Appellants.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (OUTRAGE)

The alleged instances of wrongful conduct enumerated by the Appellants and described above do not as a matter of law establish a jury question on the issue of "outrage." "[T]he court determines, in the first instance, whether the defendant's conduct may reasonably be regarded as sufficiently extreme and outrageous to permit recovery; only where reasonable persons may differ will the question proceed to the jury." Hubbard & Felix, *supra*, at 346–47 (citing *Todd v. South Carolina Farm Bureau Mut. Ins. Co.*, 283 S.C. 155, 321 S.E.2d 602 (Ct.App.1984), *quashed* (as to Equifax), 287 S.C. 190, 336 S.E.2d 472 (1985)). There is simply nothing in Respondents' actions that could be characterized as extreme and outrageous; as exceeding possible bounds of decency; or which might be regarded as atrocious and utterly intolerable in a civilized community.

## FRAUD

Appellants also purport to state a cause of action against the Conference for fraud. Appellants allege the Conference fraudulently represented it would (a) provide counseling to the Appellants to help in the healing and recovery process; and (b) create a policy and procedure on sexual harassment for presentation and adoption at the 1993 annual meeting of the Conference.

Appellants allege these promises were false and the Conference knew them to be false when they were made. Appellants further allege they relied on these promises to their detriment and damage. There is no evidence that

whatever statements were made by church officials were more than representations or promises of future action, which cannot be the basis for a cause of action for fraud. In order to be actionable, the representations must be a statement concerning an existing fact. *See Whitman v. Seaboard Air Line Ry.*, 107 S.C. 200, 92 S.E. 861 (1917); Hubbard & Felix, *supra*, at 275.

The evidence in this case is, in any event, contrary to Appellants' assertions and establishes as an undisputed fact that the Conference made available to the Appellants some funds for counseling and, in addition, appropriated funds for attendance by some of the Appellants at a seminar dealing with clergy sexual misconduct. It is apparent Appellants' contentions in this regard amount to nothing more than mere disappointment with the level of response of the Conference and Reverend Pearson. That disappointment is not legally actionable on any basis, much less fraud.

Appellants' second contention is the Conference not only failed to adopt a sexual ethics policy at its 1993 annual meeting as promised, but also never intended to present or adopt such a policy. Even if otherwise actionable, this assertion by Appellants is completely contradicted by the clear evidence in this case. Evidence establishes without question the Conference developed a sexual ethics policy in 1992; furnished copies to the Appellants in 1992; distributed copies of the proposed policy to Conference delegates in advance of the 1993 annual meeting; placed the policy on the printed agenda of that meeting; addressed and discussed the policy in its proper order; and adopted the policy as proposed. Appellants' allegations about the sexual ethics policy are simply not true.

For all the foregoing reasons, the order of the lower court is

**AFFIRMED.**

CURETON, HEARN and STILWELL, JJ., concur.