Frank MARTINELLI, Plaintiff,

v.

BRIDGEPORT ROMAN CATHOLIC
DIOCESAN CORPORATION,
Defendant.

No. 3:93CV1482 (JBA).

United States District Court,
D. Connecticut.

March 31, 1998.

William M. Laviano, Donna L. Ruhling-Laviano, Jennifer D. Laviano, Laviano Law Offices, The Executive Pavilion, Ridgefield, CT, for plaintiff.

Joseph T. Sweeney, James V. Somers, Halloran & Sage, Hartford, CT, Robert C. Danaher, Sr., Matthew G. Conway, Danaher, Tedford, Lagnese & Neal, Hartford, for defendant.

Joseph Dimyan, Pinney, Payne, Van Lenten, Burrell, Wolfe & Dillman, Danbury, CT, for James E. Sullivan, movant.

*Ruling on Defendant's Motions for Judgment as a Matter of Law [Docs. # 167, # 197]*

ARTERTON, District Judge.

In this suit against the Bridgeport Roman Catholic Diocese by its former parishioner, seeking compensation for his childhood sexual abuse by one of the Diocese's priests, the Court concludes that the First Amendment's requirement of separation of church and state does not bar adjudication of plaintiff's claims. The Court further concludes that the trial evidence was adequate to support the jury's finding that a fiduciary relationship existed and was breached in light of plaintiff's unquestioning trust reposed in his Diocese and Bishop for his moral and spiritual welfare, and the Diocese's deceptive response and failure to act on its unique knowledge of the potential jeopardy of plaintiff and other minors who were closely associated with the abusive priest. Because the evidence was sufficient to support the jury's finding of fraudulent concealment, this case is not barred by the statute of limitations.

This trial evidence was consistent with indicia recognized under Connecticut law as characterizing a fiduciary relationship: an invitation by the defendant to the plaintiff to repose his trust, the presence of the kind of relationship that generates a natural inclination to trust, and the position of the plaintiff in a position of weakness and vulnerability and the defendant in a unique position to receive and act on information bearing on plaintiff's welfare. Because the evidence was not so utterly lacking or contrary evidence so overwhelming that reasonable and fair-minded persons could only have found for the defendant, defendant's Motion for Judgment as a Matter of Law is DENIED, based on the following reasoning.

Because the determination of the plaintiff's case did not require adjudication of ecclesiastical questions, nor application of religious standards of care for clergy or church officials, the Court finds no excessive entanglement with the Court process and church tenets such that the constitutional separation of church and state is abridged.

## Background

The plaintiff, a Wisconsin resident, brought this diversity lawsuit against the Bridgeport Roman Catholic Diocese Corporation ("Diocese") to recover for damages sustained while he was a minor parishioner of the Diocese resulting from defendant's failure to investigate, warn and take remedial action following its knowledge of the sexual misconduct by Father Laurence Brett,[1] one of its parish priests.

At the close of evidence, the defendant moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a) [doc. # 167]. The Court reserved decision on defendant's motion as to Counts 3 and 4 (breach of fiduciary duty to investigate/warn/take appropriate remedial action and negligent infliction of emotional distress) as contemplated under Fed.R.Civ.P. 50(b). The jury returned a verdict for the plaintiff on Count 3, awarding $750,000 damages. The amount of this verdict has not been challenged in defendant's post-trial motions, only the adequacy of evidence supporting it and a belated First Amendment challenge.

By use of a special verdict form, the jury found that the plaintiff proved by a preponderance of the evidence that a fiduciary relationship existed between himself and the Diocese, and that the Diocese failed to prove by clear and convincing evidence that it acted consistently with that duty. The jury also found that the defendant Diocese failed to disprove by clear and convincing evidence any of the elements of the fraudulent concealment exception to the statute of limitations, which would otherwise have barred this case.

On the count of Negligent Infliction of Emotional Distress, the jury found that the defendant engaged in negligent conduct that violated a duty of care owed by it to the plaintiff, should have realized that its conduct involved an unreasonable risk of causing emotional distress to the plaintiff, and that the defendant should have realized that the emotional distress might result in illness or bodily harm to the plaintiff. The jury found, however, that the plaintiff had not proved that he suffered emotional distress that was proximately caused by the this negligent conduct. The defendant's post-trial Rule 50 motion therefore concerns only Count 3, breach of fiduciary duty [doc. # 197].

## Summary of Facts

The jury could have reasonably found the following facts from the evidence presented. In June 1962, as a newly-ordained and personally charismatic priest, Father Brett was assigned by defendant to St. Cecilia Church in Stamford, Connecticut, where the then-minor plaintiff was a parishioner with emerging aspirations to his own priesthood. During the two years that Father Brett was with St. Cecilia's through his assignment to youth work, he formed close relationships with a small group of teenage boys, including the plaintiff, who became inspired by his implementation of liturgical changes in the Roman Catholic Church as part of "Vatican II." Father Brett and the boys referred to their group as "Brett's Mavericks," "a name that [Brett] came up with that he used to describe five or six or seven of us that spent time with him talking about the liturgy, talking about Mass, talking about spiritual matters, things of that nature. It was something that made us feel real special." (R. at 933). According to the plaintiff, Brett acted as a mentor and spiritual advisor to "Brett's Mavericks," but also abused this position of authority and trust by sexually abusing plaintiff and other members of the group. Plaintiff recalled three specific incidents of his personal sexual abuse by Brett during the time that Brett was at St. Cecilia's.

As described by the plaintiff, the first incident occurred at St. Cecilia's Parish behind the grade school:

Well, my recollection is that it was after confession, we—he customarily walked—we did a walking confession outside frequently... We were walking along, confession finished, we happened to be in the back of the school near that X [on a photograph], and then all of a sudden he stopped me and began to help me pull down my pants and proceeded to perform fellatio on me.

---

1. Father Brett was dismissed as a defendant on July 31, 1997 due to lack of service of process.

(R. at 958). The second incident took place in Brett's car in the parking lot of St. Cecilia's:

> We were in his car. He pulled his penis out. He asked me to bring my mouth down on it, and my recollection is that I must have hesitated because he said, 'It's OK, it's another way of receiving Holy Communion.'

(R. at 938). The third incident took place in Baltimore, during a trip that the plaintiff took with Brett and another member of Brett's Mavericks. Mr. Martinelli described it as taking place in the bathroom of the seminary where they stayed:

> Well, at one point we were in a large bathroom, it was a big bathroom, it had small white tile, I was in my underwear and T-shirt, and at one point he pulled my underwear down, sort of pushed my shoulders back, kind of arched my back so my pelvis was kind of thrust forward, and he fondled me, and that's it.

(R. at 970).

After he became an adult, Mr. Martinelli lost his memories of that abuse, and it was only in 1991, during a phone conversation with a high school friend and fellow Brett's Maverick as the friend made reference to Brett's abuse of him that the memories of Martinelli's own experiences came flooding back to him. As the plaintiff described it, the feelings came "from the center of my being, these just really strong feelings, like a wave, and I started to cry and I said, 'Tony, I think that's what happened to me.'" (R. at 971).

In September 1964, Father Brett left St. Cecilia's, to join Sacred Heart University in Bridgeport as a spiritual director, and served as a member of a diocesan commission on sacred music and the liturgy. On December 1, 1964, a parent complained to the Diocese that Brett had sexually molested his 19-year-old son and Sacred Heart student ("T.F."). The Diocese's report of the matter indicates that Father Brett admitted the accuracy of T.F.'s complaint to the Bishop and as well informed him and the other diocesan officials present that "his problem," which he "discovered" while in Stamford, was known to only a small number of other people and

that he had sought counseling for it. The report noted that T.F. "was worried about the other boys who had gone to New York with Father Brett," although Father Brett "denie[d] that anything happened on those occasions." The report concluded that Brett was to be removed from his duties and that "a recurrence of hepatitis was to be feigned should anyone ask."

Brett was thereafter sent to New Mexico to the Via Coeli Monastery, Servants of the Paraclete, ostensibly for psychiatric treatment. Although the Diocese declined Brett's requests to resume work as a priest in Connecticut, it continued to provide him with financial support and took no steps to alter his status as a priest. The Diocese was also aware when Brett returned to Connecticut to live with his aunt and that he was assisting in the aunt's parish of St. Augustine's Church in Seymour, Connecticut.

In January 1966, the Bridgeport Diocese received a second complaint about Father Brett's past sexual misconduct with boys in Connecticut. According to the Diocese's reportage of the complaint, Father Brett was alleged to have offered a "solicitation to homosexual misconduct" to a high school student in Bridgeport in late 1963. The boy ("M.F.")—whom plaintiff has identified as one of his fellow "Brett's Mavericks"—indicated that he declined Father Brett's offer and terminated his relationship with the priest, and a year later brought the incident to the attention of the pastor of St. Cecilia's, who apparently did not refer the complaint to diocesan authorities. However, when M.F. subsequently required psychiatric hospitalization, his parents approached diocesan officials directly for financial assistance with treatment costs for their son's mental illness that they attributed to Father Brett's misconduct.

In a letter detailing the M.F. incident and the Diocese's response, Bishop Curtis observed as follows:

> In the original complaint against Father Brett [T.F.'s complaint] the name of [M.F.] was not mentioned. In the interview, however, with Msgr. Kearney, when he admitted the homosexual attack upon another

student, Father Brett seemed to indicate that there was at least one other incident. I have no way of knowing whether this might have been the case of [M.F.] or not.

[M.F.] probably became aware of Father Brett's disappearance from the Diocese because the high school is close to the university. However, I doubt that he knew the precise reason since the incident involving the university student did not become known, and the departure of Father Brett was accomplished very quietly. Factually, in February of 1964 Father Brett had been hospitalized for an attack of hepatitis and in April was released a second time after a relapse in health for this same problem. Hence those who knew him would have judged that his health failed again.

. . .

Nor was the Diocese of Bridgeport negligent, as the parents hint, since it was unaware of the incident.

The Diocese has given no information to [M.F.'s family] on the reason for Father Brett's absence. They claim however to know of the priest's psychiatric problem, but no admission of this has ever been made to them.

The Diocese declined to provide financial support for M.F.'s psychiatric care or to take any other investigative or remedial steps in response to the allegations. Moreover, reasonable jurors could have inferred from this document and the previously-described "hepatitis memo" defendant's awareness of its potential legal liability and intention to conceal.

Notwithstanding this second report of misconduct, Father Brett continued as a priest incardinated to and under the jurisdiction of the Diocese and Bishop of Bridgeport. Meanwhile, plaintiff testified that he developed and suffered from psychological and emotional problems that were intractable despite adult therapy until his 1991 memory breakthrough. His damages encompassed difficulties with personal relationships and work performance, feelings of insecurity, and

a loss of faith in his Church and its assurance of his afterlife. He testified that after his conversation with fellow "Maverick" Tony C., he belatedly became able to understand the abuse as the source of his long-term emotional problems and thereafter experienced some therapeutic alleviation of his condition. After relating his early accomplishments in sports and school leadership but subsequent apathy and lack of continued distinction, plaintiff lamented his losses and damages resulting from not receiving contemporaneous therapy for the abuse: "The big deal is I'll never really know what my life could have been—would have been like if Father Brett hadn't abused me as a kid. I don't know what I would be doing right now. I don't know if work would have been the same, I don't know if I would have been more successful, if we would have been living in a different house. I don't think I would have been as unhappy as I've been in my life." (R. at 1014.). Mr. Martinelli further testified as to the loss of his faith: "I believe that sexual abuse at the hands of Father Brett has something to do with my loss of my faith and the practice of the Catholic religion. . . . As I've understood the impact of the abuse, the sexual abuse by Father Brett, and the possible connection between that and my loss of faith, it's made me sad and it's made me angry." (R. at 925–26).

### Standard of Review Under Rule 50(b)

Pursuant to Rule 50(a), the court may grant a motion for judgment as a matter of law against a party in the event that "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1).[2] If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all evidence, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R.Civ.P. 50(b). The Second Circuit has recognized that "the prudent course of action is to submit the case to the jury and to grant

---

**2.** In the absence of any evidence that the molestation had actually taken place in the course of Brett's conduct of his religious duties, the Court

granted defendant's Motion for Judgment on Count 4 for vicarious liability for Brett's actions.

judgment as a matter of law, if necessary, after the verdict has been returned, so that if the court of appeals eventually determines that judgment should not have been granted as a matter of law, the need for a second trial will be avoided." *Galdieri–Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276, 281 (2d Cir.1998) (citations omitted).

> The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment... In ruling on a renewed motion, the court may:
>
> > (1) if a verdict was returned:
> >
> > > (A) allow the judgment to stand,
> > >
> > > (B) order a new trial, or
> > >
> > > (C) direct entry of judgment as a matter of law; ...

Fed R. Civ. P. 50(b). A district court may grant a motion for judgment as a matter of law only if

> there exists "such complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or the evidence in favor of the movant is so overwhelming "that reasonable and fair minded [persons] could not arrive at a verdict against [it]."

*Luciano v. The Olsten Corp.*, 110 F.3d 210, 214 (2d Cir.1997) (*quoting Cruz v. Local Union No. 3*, 34 F.3d 1148, 1154 (2d Cir.1994)). "Judgement n.o.v. is proper 'only if the evidence viewed in the light most favorable to the non-movants, without considering credibility or weight, reasonably permits only a conclusion in the movant's favor.' " *Doctor's Assoc., Inc. v. Weible*, 92 F.3d 108, 112 (2d Cir.1996) (*quoting Baskin v. Hawley*, 807 F.2d 1120, 1129 (2d Cir.1986)). In order to grant a motion for judgment as a matter of law, the court must find "either an utter lack of evidence supporting the verdict," *Doctor's Assoc.*, 92 F.3d at 112, or the evidence must be "so overwhelming that reasonable and

fair-minded persons could only have reached the opposite result," *Baskin*, 807 F.2d at 1129. Federal Rule of Civil Procedures 50(b) "generally proscribes judgment n.o.v. on any ground not specifically raised in an ·earlier motion for a directed verdict at the close of all the evidence," unless relief from the specificity requirement is necessary to avoid manifest injustice. *Doctor's Assoc.*, 92 F.3d at 112, 113.

### Statute of Limitations and Fraudulent Concealment

Under Connecticut law, the statute of limitations in actions to recover for personal injury to a minor caused by sexual abuse is limited to seventeen years after that person attains the age of majority. Conn. Gen.Stat. § 52–577d.[3] Mr. Martinelli, born on August 3, 1947, did not file suit until July 27, 1993—almost 25 years after he reached the age of majority.[4] Clearly, absent a basis for tolling the statute of limitations, Mr. Martinelli would be time-barred from bringing this suit. To this end, the plaintiff has invoked the doctrine of fraudulent concealment. As codified in Conn. Gen.Stat. § 52–595, the doctrine of fraudulent concealment provides that,

> if any person, liable to an action by another, fraudulently conceals from him [or her] the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence.

In order to meet the burden of proof under Conn. Gen.Stat. § 52–595, a plaintiff is

> required to show: (1) a defendant's actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiff's cause of action; (2)[ ] defendant's intentional concealment of these facts from the plaintiff; and (3)[ ] defendant's concealment of the facts for the

---

**3.** The statute reads in pertinent part: "Notwithstanding the provisions of Section 52–577, no action to recover damages for personal injury to a minor, including emotional distress, caused by sexual abuse, sexual exploitation or sexual assault, may be brought by such person later than seventeen years from the date such person at-

tains the age of majority." Conn. Gen.Stat. § 52–577d.

**4.** *See* Conn. Gen.Stat. § 1–1d (until October 1, 1972, the age of majority was twenty-one years of age).

purpose of obtaining delay on the plaintiff's part in filing a complaint on their cause of action.

*Bartone v. Robert L. Day, Inc.,* 232 Conn. 527, 533, 656 A.2d 221 (1995). The plaintiff has acknowledged that he cannot meet the requirements of *Bartone* because it is undisputed that the defendant had no actual awareness of this parishioner plaintiff individually until this lawsuit was commenced. Nevertheless, he argues that under Connecticut law, the Diocese may not avail itself of its ignorance now when such ignorance was the direct result of its own breach of its fiduciary duty to investigate, by which it would have learned plaintiff's identity and plight. As discussed in this court's Ruling on Defendant's Motion for Summary Judgment, there is ample support in the case law for the proposition that a defendant may not avoid application of § 52–595 by relying on the violation of a legal duty. *See Hamilton v. Smith,* 773 F.2d 461, 468 (2d Cir.1985); *Lapuk v. Simons,* 1995 WL 5633, *16 (Conn.Super.1995); *Manufacturers Hanover Trust Co. v. Stamford Hotel Limited Partnership,* 1994 WL 720368, *3 (Conn.Super.1994). *See also A.M. v. Roman Catholic Church,* 669 N.E.2d 1034, 1038 (Ind.Ct.App.1996); *Koenig v. Lambert,* 527 N.W.2d 903, 906 (S.D.1995).

The threshold jury inquiry, therefore, was whether plaintiff proved the existence and breach of such a fiduciary relationship between the plaintiff and his parents on the one hand, and the Diocese on the other and whether the nature of the proved breach by defendant resulted in its ignorance of plaintiff's circumstances at the hands of Father Brett at St. Cecilia's. The parties agree that if plaintiff proved the existence of a fiduciary relationship, that it was defendant's burden to disprove that it breached its fiduciary duty, hence disproving that it fraudulently concealed plaintiff's cause of action.

The jurors in this case, put to the difficult task of sorting out these complexities by means of a special verdict form intended to guide their analysis, did indeed find that the statute of limitations had been tolled under the doctrine of fraudulent concealment, as a result of their finding the existence of a fiduciary duty by the defendant Diocese and breach thereof.[5]

The defendant now argues in its post-trial Rule 50(b) motion that there was no legally sufficient evidentiary basis to support the jury's finding that the Diocese had any fiduciary obligations towards Mr. Martinelli or his parents. Defendant also belatedly argues that this Court is barred under the First Amendment from adjudicating plaintiff's claim.

### First Amendment and Excessive Entanglement

■ The defendant Diocese claims that, regardless of the particular circumstances of this case, this court cannot adjudicate the fiduciary duty issue without running afoul of the First Amendment prohibition on excessive entanglement with a religious organization.[6] The First Amendment to the United States Constitution forbids any "law respecting the establishment of religion, or prohibition of the free exercise thereof." U.S. Const. Amend. I.

The defendant maintains that a claim for breach of fiduciary duty requires an examination of the very creed under which the Catholic Church exists, and an inquiry into the fundamental perspective and approach inherent in the beliefs and practices of that denomination. The Diocese cites to such cases as *Dausch v. Rykse,* 52 F.3d 1425 (7th Cir.1994) and *Schmidt v. Bishop,* 779 F.Supp. 321 (S.D.N.Y.1991) to support its position on applicability of the First Amendment to the adjudication of this case. Both rejected breach of fiduciary duty claims against clergy persons as clergy malpractice claims requiring impermissible adjudication of the defini-

---

**5.** The complete verdict form to which all counsel consented is appended.

**6.** The Rule 50(b) stage is an admittedly awkward point at which to consider this constitutional issue, which should have been raised for consideration at the summary judgment stage. The issue was not raised by the defendant until its motion for reconsideration of the summary judgment ruling. Because the issue had not been properly raised or briefed at that time, the Court denied the motion for reconsideration, but gave leave to the defendant to raise the issue at the Rule 50 stage.

tion and application of a reasonable clergy community standard.

In *Dausch*, plaintiff brought claims against her Presbyterian Church and pastor alleging that the pastor had engaged in improper sexual conduct with her during their counseling relationship. The trial court dismissed the plaintiff's count of breach of fiduciary duty as "an elliptical way to state a clergy malpractice claim." 52 F.3d at 1429. The appeals court agreed with this characterization, and explained that "if the court were to recognize such a breach of fiduciary duty, it would be required to define a reasonable duty standard and to evaluate Rykse's conduct against that standard, an inquiry identical to that which Illinois has declined to undertake in the context of a clergy malpractice claim and one that is of doubtful validity under the Free Exercise Clause." *Id.* at 1438 (Ripple, J., concurring).

The *Schmidt* court, faced with a similar fact pattern, came to a similar conclusion. "[I]n analyzing and defining the scope of a fiduciary duty owed by their clergy, the Court would be confronted by the same constitutional difficulties encountered in articulating the generalized standard of care for a clergyman required by the law of negligence... Ms. Schmidt's fiduciary duty claim is merely another way of alleging that the defendant grossly abused his pastoral role, that is, that he engaged in malpractice." 779 F.Supp. 321, 326. "Any effort by this Court to instruct the trial jury as to the duty of care which a clergyman should exercise, would of necessity require the Court or the jury to define and express the standard of care to be followed by other reasonable Presbyterian clergy of the community."

Following this analysis, the court in *H.R.B. v. J.L.G.*, 913 S.W.2d 92 (Mo.Ct.App.1995), decided to:

align ourselves with the jurisdictions that have refused to recognize breach-of-fiduciary duty action against clergy for sexual misconduct.... Religion was not merely incidental to plaintiff's relationship with defendant, the archbishop, and the church; it was the foundation for it. Counts I and VIII will inevitably require inquiry into the religious aspects of this relationship, that

is, the duty owed by Catholic priests, parishes, and dioceses to their parishioners. *Id.* at 99. This Court perceives error in a per se analogy of a fiduciary duty claim to one of clergy malpractice, in that while the clergy malpractice claim may require the development of a "reasonable clergy" standard, the fiduciary duty claim does not necessarily require such an inquiry inasmuch as the standard to which a fiduciary is held is not that of a "reasonable clergy person," or "reasonable Diocese," but rather that of a "fiduciary." In other words, rather than being restricted to consideration of a standard of care to be followed by clergy persons or other religious entities, a court or jury can, in some circumstances, measure a religious organization's or official's conduct by pre-existing secular standards of care to which all fiduciaries are held.

The Connecticut Supreme Court has developed a hybrid approach in church property disputes that successfully accommodates First Amendment principles by combining the "neutral principles of law" doctrine of *Jones v. Wolf*, 443 U.S. 595, 604, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), with the approach of *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871), in which deference is accorded to the highest church tribunal that has ruled on a question "of discipline, or of faith, or ecclesiastical rule, custom, or law." *See Trinity—St. Michael's Parish v. Episcopal Church*, 224 Conn. 797, 620 A.2d 1280 (1993), In explicating how these church matters must be approached, the Connecticut Supreme Court has stated:

[T]he United States Supreme Court concluded that although the analysis may involve examination of some religious instruments, such as a church constitution, the inquiry must be performed in purely secular terms without relying 'on religious precepts in determining whether the document indicates that the parties have intended to create a trust.'

*Id.* at 803, 620 A.2d 1280 (*quoting Jones v. Wolf*, 443 U.S. 595, 604, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979)). The Court's research gives no indication that the Connecticut Supreme Court would decline to use this approach in other types of common law dis-

putes involving a church entity, permitting civil litigation of common law rights based on secular considerations, an approach consistent with the teaching of *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).[7]

Courts applying Connecticut law have concluded that the First Amendment does not bar claims of negligence against the Catholic Church. In *Nutt v. Norwich Roman Catholic Diocese,* 921 F.Supp. 66 (D.Conn.1995), and *Doe v. Norwich Roman Catholic Diocesan Corp.,* 1996 WL 409283 (Conn.Super.1996), both courts found that the "court's determination of an action against the defendants based upon their alleged negligent supervision of [a priest] would not prejudice or impose upon any of the religious tenets or practices of Catholicism." *Doe,* 1996 WL 409283 at *2 (*quoting Nutt,* 921 F.Supp. at 74). *Cf. Mullen v. Horton,* 46 Conn.App. 759, 700 A.2d 1377 (1997) (reversing grant of summary judgment for defendant religious orders on claim of vicarious liability for priest's sexual misconduct without analysis or discussion of First Amendment).

It is instructive to examine how other courts have applied the neutral principles of law inquiry in the context of clergy sexual abuse. In its extensive discussion of the constitutional implications of imposing tort liability on a church or diocese, the Supreme Court of Colorado concluded that "The First Amendment to the United States Constitution does not grant religious organizations absolute immunity from tort liability. Liability can attach for breach of a fiduciary duty, negligent hiring and supervision." *Moses v. Diocese of Colorado,* 863 P.2d 310, 318 (Colo. 1993), *cert. denied,* 511 U.S. 1137, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994). Following the neutral principles line of cases, the court explained that, "Application of a secular standard to secular conduct that is tortious is not prohibited by the Constitution." *Id.* at 320. In applying the doctrine to the facts before it, the Colorado Supreme Court found that:

> The facts of Tenantry's case indicate that an organization, confronted with the mis-

deeds of one of its agents, assumed control of the matter and in the process of protecting itself injured a vulnerable individual. The defendants have not argued that Bishop Frey's decision to assume control and resolve the problems created by Father Robinson and Tenantry's relationship was a matter of purely ecclesiastical concern. Tenantry's claims in this case do not involve disputes within the church and are not based solely on ecclesiastical or disciplinary matters which would call into question the trial court's power to render a judgment against the defendants.... Because the facts of this case do not require interpreting or weighing church doctrine and neutral principles of law can be applied, the First Amendment is not a defense against Tenantry's claim.

*Id.* at 321. In *Doe v. Hartz,* 970 F.Supp. 1375, 1431 (N.D.Iowa 1997), *rev'd on other grounds,* 134 F.3d 1339 (8th Cir.1998), a case against a priest, bishop, diocese, and church for sexual abuse of the plaintiff, the court found that "negligent supervision can probably be determined applying only neutral principles of law and an inquiry that does not intrude upon church doctrine or policy." Similarly, in *Isely v. Capuchin Province,* 880 F.Supp. 1138 (E.D.Mich.1995), an action against priests for sexual abuse, the court explained that "the Supreme Court has made clear that if only 'neutral' principles of law can be applied without determining underlying questions of church law and policies, then a court may intervene." *Id.* at 1151 (*citing Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 724–25, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); *Wisconsin v. Yoder,* 406 U.S. at 215, 92 S.Ct. 1526).

Other courts have found that the First Amendment is not a bar to the adjudication of a church's status as a fiduciary. In *Erickson v. Christenson,* 99 Or.App. 104, 781 P.2d 383 (1989), *appeal dismissed,* 311 Or. 266, 817 P.2d 758 (1991), the Court of Appeals of Oregon differentiated between a claim for breach of fiduciary duty and a claim of clergy malpractice, and allowed the plaintiff to pro-

---

**7.** "A way of life, however virtuous and admirable, may not be imposed as a barrier to a reasonable state regulation ... if it is based on purely secular considerations." *Wisconsin v. Yoder,* 406 U.S. at 215, 92 S.Ct. 1526.

ceed with her fiduciary duty claim against a pastor, the Lutheran Church, and the district office of the Lutheran denomination based on claims that the pastor mentally manipulated her and seduced her during a counseling relationship.

This Court concludes that the fiduciary duty claim here was capable of being resolved under Connecticut law using neutral principles and that to do so neither the Court nor the jury needed to evaluate or weigh ecclesiastical standards based on church doctrine or inquire into matters of purely ecclesiastical nature to assess the conduct of the Diocese under the circumstances of its knowledge and position. How the Diocese chose to deal with Father Brett by way of discipline was not relevant to consideration of its duty to its minor parishioners at risk to investigate the distinct likelihood known to it that other young victims existed within its own flock who needed its warning and care. Under Connecticut law, such consideration is capable of being undertaken by neutral, secular and generally applicable standards.

In *Dunham v. Dunham*, 204 Conn. 303, 322, 528 A.2d 1123 (1987), the Connecticut Supreme Court set out the standard for the existence of a fiduciary relationship, explaining that such a relationship may be found where "there is a justifiable trust confided on one side and a resulting superiority and influence on the other." To the extent the inquiry as to the existence or nature of the elements of this relationship references or applies uncontroverted religious doctrine or canon law, a court is not prohibited from considering such material, so long as such consideration does not involve interpreting, questioning, or weighing such ecclesiastical concerns. In fact, this Court used this principle as a guideline in its evidentiary rulings throughout the trial. Official church documents, such as excerpts from canon law, were admitted only if there was no challenge as to their meaning or applicability. No area of church doctrine was subject to interpretation or question by the Court or jury. A secular standard of fiduciary duty could thus be used to evaluate behavior by the diocesan officials in responding to information which they had obtained because of their diocesan status, and which only they had, that was highly suggestive of a pattern of criminal behavior by a diocesan priest. Accordingly, the First Amendment entanglement clause is thereby not implicated.

The defendant's argument, that the diocesan conduct at issue is ecclesiastical in nature in that it concerns the disciplinary methods chosen by the church that are inextricably bound up in traditional concepts of deference to the scared status of the priest, is misplaced because the conduct of relevance is that pertaining to the diocese and its parishioner. While evidence of the shepherd-flock symbols and teachings were used to illustrate the source and justification for the trust reposed by young Martinelli (and his parents) in and fostered by the Bishop, they represent an undisputed, fundamental precept of Church hierarchy. Therefore, it is clear that examination of the Diocese's secular obligations toward its minor parishioners, who it alone had strong reason to believe had been injured by or put at risk by its priest's misconduct does not necessarily implicate religious precepts of mercy shown by the Bishop to that priest; rather, it focuses on whether the Diocese should have investigated at St. Cecilia's, and given Brett's Mavericks warning, protection and remedial counseling once it knew of the danger to young boys like the plaintiff in Father Brett's care at the time and place Father Brett's "problem" first manifested itself according to Brett's admissions to it. Evidence of the Diocese's inaction and conduct of evasion and intended deception is neither inconsistent with issues of mercy for Father Brett, nor does it invoke religious precepts: the jury was simply asked to determine whether it found by a preponderance of "evidence that there existed a special relationship characterized by a unique or special degree of trust and confidence between [Martinelli] and the defendant Diocese," in accordance with the Court's instructions. In this analysis, this Court heeds the warning of the Connecticut Supreme Court that:

The principle of deference to ecclesiastical adjudication of disputes concerning ecclesiastical doctrines and practices does not rest on the mandates of the constitution alone. Secular courts should view with

skepticism their competence to decide ecclesiastical questions, which are often as markedly arcane and complex as they are heatedly controverted.

*New York Annual Conference of the United Methodist Church v. Fisher,* 182 Conn. 272, 280, 438 A.2d 62 (1980). However, neither this Court nor the jury was required to attempt any such undertaking. Just as a court, "in deciding secular questions arising out of concepts of property and trust law . . . may not only examine the deeds of conveyance or of trust but may also scrutinize certain religious documents, such as a church constitution, for language of trust," *Fisher,* 182 Conn. at 283, 438 A.2d 62, the jury in this case merely was given the opportunity to examine undisputed ecclesiastical materials in order to decide whether there was a factual basis for concluding the existence and breach of a fiduciary duty. Thus, the First Amendment does not preclude a party in plaintiff's circumstances from presenting a factual basis for the existence of a fiduciary relationship between himself and his Diocese and his theory of breach.

## Fiduciary Duty

There are few legal concepts more frequently invoked but less conceptually certain than that of the fiduciary relationship. In specific circumstances and in specific relationships, courts have no difficulty in imposing fiduciary obligations, but at a more fundamental level, the principle on which that obligation is based is unclear. Indeed, the term "fiduciary" has been described as "one of the most ill-defined, if not altogether misleading terms in our law." [8]

■ In Connecticut, a fiduciary relationship is a relationship that is "characterized by a unique degree of trust and confidence between the parties, one of whom is under a duty to represent the interests of the other." *Dunham v. Dunham,* 204 Conn. at 322, 528 A.2d 1123. It may be found to exist where "there is a justifiable trust confided on one side and a resulting superiority and influence

on the other." *Id.* at 320, 528 A.2d 1123. Moreover, the Connecticut Supreme Court has "carefully refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations." *Harper v. Adametz,* 142 Conn. 218, 225, 113 A.2d 136 (1955).

■ In perhaps one of the most famous legal explorations of the fiduciary relationship issue, the esteemed jurist Benjamin Cardozo explained that a fiduciary "is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is the standard of behavior." *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545 (1928). "Familiar forms of fiduciary relationships include trustee-beneficiary, agent-principal, corporate director/officer-corporation, and partner-partnership, although courts have emphasized that these categories are not exclusive. In any of these paradigmatic forms, a beneficiary entrusts a fiduciary with control and management of an asset." Cooter & Freedman, *supra* at 1046. In Connecticut, for example, "[a]n officer and director occupies a fiduciary relationship to the corporation and its stockholders." *Pacelli Bros., Trans. v. Pacelli,* 189 Conn. 401, 407, 456 A.2d 325 (1983).

■ The Diocese has emphasized throughout this case that the diocesan population consists of approximately 300,000 persons, with between 80–88 affiliated local parish church corporations. Not only does the Diocese contend that they cannot, as a matter of law, have a fiduciary responsibility for all 300,000 parishioners, but also that no single parishioner can have a fiduciary relationship with the Diocese unless there has been one-on-one contact between that parishioner and a Diocesan official, which did not exist here.

In addition to the courts that have rejected a fiduciary duty cause of action on First Amendment grounds, *see supra,* others have found inadequate factual basis for a fiduciary relationship. In *Brown v. Pearson,* 326 S.C. 409, 483 S.E.2d 477 (App.1997), the Court of

---

**8.** Robert Cooter & Bradley J. Freedman, *The Fiduciary Relationship: Its Economic Character and Legal Consequences,* 66 N.Y.U. L.Rev. 1045, 1045 n. 2 (1991) (*quoting LAC Minerals Ltd. v. International Corona Resources Ltd.,* 61 D.L.R.4th 14 (Can.1989)).

Appeals of South Carolina affirmed the trial court's grant of summary judgment to the defendant in an action against a Methodist church and its district superintendent where five church members alleged that the Reverend Jerry Brunson sexually harassed and abused three of the plaintiffs. The plaintiffs reported the misconduct to the church, but the Court found that:

> the mere expectation on the part of the Appellants that Reverend Pearson and the Conference would take action on their complaints [did not] create any such relationship. The steps taken unilaterally by the [parishioner] Appellants do not constitute an attempt on their part to establish the relationship alleged, and there is *no evidence that Respondents accepted or induced any special, fiduciary bond with any of the Appellants under these facts in any event.*

*Id.* at 485. In contrast to the trial evidence here, the Court of Appeals of South Carolina found that there was no evidence that the defendant church invited the plaintiffs to repose their trust in it, either through its ecclesiastical teachings or other actions or that plaintiff's trust was otherwise justified. In fact, the evidence before the court showed that the defendant openly rejected the plaintiffs' trust: "Respondents' obvious intentions and obligations were to take into account the positions on both sides of the issues involved." *Id.* Unlike the evidence, which was presented in this case, of lessons of trust and faith taught to Mr. Martinelli by the defendant, the defendant South Carolina Conference of the United Methodist Church was not shown to have in any way invited the plaintiffs to place their trust in it or that the relationship otherwise had any indicia of trust or confidence.

In contrast, the South Dakota Supreme Court, in *Koenig v. Lambert*, 527 N.W.2d 903 (S.D.1995), *overruled on other grounds by Stratmeyer v. Stratmeyer*, 567 N.W.2d 220 (1997), upheld a cause of action for breach of fiduciary duty between a parishioner and a Roman Catholic diocese. In reversing a grant of partial summary judgment for the defendant, the court explained that a fiducia-

ry relationship could and did exist between the plaintiff and the Diocese:

> The Diocese and its members were not only acting as members of the church they were also acting as agents or representatives of God. Koenig, as a Catholic parishioner and altar boy, was taught to trust and respect the members of the Diocese. Koenig put his trust and faith in the members of the Diocese, and was encouraged to do so by the Diocese.
>
> This Court has found relationships of trust or confidence several times in the past, including the relationships between doctor and patient, architect and client, attorney and client, and tenants in common. Certainly if there is a trust relationship in those instances there must also be one between a Diocese and the members of the faith it purports to serve.

*Id.* at 906.

Also concluding that the *type* of trust or confidence reposed in and accepted by a diocese was consistent with that giving rise to a fiduciary duty, the Supreme Court of Colorado in *Moses v. Diocese of Colorado*, 863 P.2d 310 (Colo.1993), found a fiduciary relationship between a Diocese and an individual parishioner where the plaintiff had sought counseling from an assistant Episcopal priest at her parish who then began a sexual relationship with her.

The *Moses* court observed that "The clergy-parishioner relationship is not necessarily a fiduciary relationship. It does, however, involve the type of interaction that creates trust and reliance." *Id.* at 321. In particular, the Court emphasized the nature of the interaction between the plaintiff and the Bishop in finding a fiduciary duty:

> In the meeting between Bishop Frey and [the plaintiff] the parties did not occupy equal positions. Bishop Frey held a position of authority in the church and has the power to resolve conflicts in the church.... The superior position of Bishop Frey and the power he had over Tenantry is evinced by Tenantry's request for permission to talk to people in her family and for special permission to speak to her husband.... The defendants assert they are not liable because Bishop Frey and the

Diocese did not take any action that would allow the jury to conclude they assumed a duty to Tenantry. There is sufficient evidence that the defendants assumed a duty to Tenantry when they acted to resolve the problems that were the result of the relationship between Father Robinson and Tenantry. *Id.* at 322–23. The duty found in *Moses*, therefore, was premised on the plaintiff's vulnerable and subservient state in relation to the Diocese and its Bishop, and on the Bishop's affirmative undertaking in relation to the problem of a sexually abusive clergy member.[9]

On the other hand, the Supreme Court of North Dakota rejected a fiduciary duty claim for lack of a sufficient factual basis. The case of *L.C. v. R.P.*, 563 N.W.2d 799 (N.D. 1997), was brought against a pastor and a Methodist church after the plaintiff became involved in a sexual relationship with the pastor who had been counseling her in the wake of the plaintiff's husband's death. The Court upheld the grant of summary judgment in favor of the church on the issue of fiduciary duty, explaining that "although there was evidence Bishop Boulton and the Conference were informed about the intimacy between [the plaintiff] and [the pastor], we are not persuaded that knowledge, by itself and without some other action to assume control of the matter, raises an inference that the Conference assumed a fiduciary duty to [the plaintiff]." *Id.* at 802. The plaintiff had argued that the Book of Discipline of the United Methodist Church imposed a fiduciary duty on the Bishop and the Conference to investigate, charge, and try

clergy for sexual improprieties. The Court's conclusion that the Church had not assumed such a duty, however, was made in the absence of consideration of the Book of Discipline of the United Methodist Church as this document was not deemed part of the record before the Supreme Court of North Dakota.[10] Similar to the *Brown v. Pearson* case, the *L.C. v. R.P.* court was not presented with any evidence from which it could be inferred that the Church invited the parishioner to confide her trust in it, either through its teachings or otherwise, nor was there evidence that the plaintiff did confide her trust or rely on the defendant in any way. *See* 563 N.W.2d at 802. *See also Smith v. O'Connell*, 997 F.Supp. 226 (D.R.I.1998) ("[T]he record is barren of any evidence regarding the existence or nature of any fiduciary relationship between the plaintiffs and the hierarchy defendants"). In this case, plaintiff presented evidence of both defendant's doctrinal invitations and training, plaintiff's resulting complete trust and reliance, as well as defendant's actions to take control of the abuse reported to it.

In *Dunham v. Dunham*, 204 Conn. 303, 528 A.2d 1123, the trial court allowed the jury to decide the existence of a fiduciary relationship between two brothers, notwithstanding the absence of an attorney-client relationship. There, the record showed that the younger brother relied on his older brother "as a brother and advisor," and that this older brother "was a lawyer and was better versed in the management and operation of the family estate." *Id.* at 319 n. 11,

9. Courts have had less difficulty in finding a fiduciary relationship between a parishioner and a clergy person, as distinguished from a church or diocese. In a case of a Catholic priest allegedly abusing a counseling relationship, the Supreme Court of Colorado had "no difficulty in finding that Grabrian [the defendant], as a marriage counselor to Robert and Edna, owed a fiduciary duty to Edna [the plaintiff]." *DeStefano v. Grabrian*, 763 P.2d 275, 284 (Colo.1988). This duty was "'created by his undertaking' to counsel her. Grabrian had a duty, given the nature of the counseling relationship, to engage in conduct designed to improve the DeStefanos' marital relationship." *Id.* (citation omitted). *See also Sanders v. Casa View Baptist Church*, 898 F.Supp. 1169, 1176

(N.D.Tex.1995), *aff'd*, 134 F.3d 331 (5th Cir. 1998) ("if Plaintiffs' allegations are true, the Court would have little difficulty finding that Baucum owed Plaintiffs a fiduciary duty as a marriage counselor to Plaintiffs.... His duty would be created by his undertaking to counsel them"); *Jones v. Trane*, 153 Misc.2d 822, 591 N.Y.S.2d 927, 931 (1992) (allowing claims to go forward based in part on the fact that "the misconduct charged is the sexual abuse of an infant").

10. Apparently, the book was not included in the record, and the plaintiff's counsel did not take steps to correct or modify the record. *See L.C. v. R.P.*, 563 N.W.2d at 802.

528 A.2d 1123. The Connecticut Supreme Court found:

> On the present record, which indicates that the defendant is the older brother of the plaintiff, and that the plaintiff continually placed his trust and confidence in the defendant for both legal and nonlegal advice, we are convinced that the court properly submitted this issue to the jury.

Even though there was no explicit invitation from the older Dunham to the younger Dunham to trust in him, the nature of the sibling relationship, combined with the kind of information possessed by the older brother was enough to make the younger brother's trust justifiable. Similarly, in *Moses*, the Court concluded that the relationship between a parishioner and a clergy person involves a *type* of interaction that creates trust and reliance, which may be sufficient to establish a fiduciary relationship. The similarity of the trust aspects of the relationship between brothers and the relationship between a parishioner and his or her church authority is recognized in the Old Testament teaching in which the sibling relationship is held up as a paradigm of closeness and trust, but contrasted with a "friend"—God or the Church as God's representative—who is even more trustworthy than a brother: "there is a friend that sticketh closer than a brother," *Proverbs* 18:24.

In *Dunham*, the Connecticut Supreme Court relied in part on *Alaimo v. Royer*, 188 Conn. 36, 448 A.2d 207 (1982), involving a plaintiff who suffered physical and mental disabilities resulting from a childhood illness, and who sought advise about the management of her life savings from the defendant, who held himself out to be a knowledgeable real estate and investment advisor, and encouraged the plaintiff to rely upon him for investment purposes. *Id.* at 37, 448 A.2d 207. Ms. Alaimo alleged that Mr. Royer "represented that he would take care of her financially, that he would safeguard her money, and that she could place her trust in him." *Id.* at 41, 448 A.2d 207. Based on these facts, the Connecticut Supreme Court explained that, "We cannot say that the record in this case is as a matter of law inadequate to support a finding of a fiduciary relationship. Where such a relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary." *Id.* (citations omitted). Royer's fiduciary duty to Ms. Alaimo rested on his invitation to her to repose her trust and her position of vulnerability.

In *Harper v. Adametz*, 142 Conn. 218, 113 A.2d 136 (1955), relied on in both *Dunham* and *Alaimo*, the defendant was a real estate agent who had advertised a farm for sale in a local newspaper. The defendant lied to the plaintiff, a potential buyer, in order to obtain the farm property for himself at a lower cost. "By his fraudulent representations, he deprived the plaintiff of his bargain and obtained for himself some of the land which the plaintiff had offered to buy." *Harper*, 142 Conn. at 225, 113 A.2d 136. The Connecticut Supreme Court, explaining its willingness to apply a rule of equity that ordinarily is applied in situations in which there is a fiduciary relationship, stated that equity "has carefully refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations. It has left the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." *Id.* Because plaintiff Harper was invited by the defendant Alaimo's "advertisement to bid for the property, he had a right to assume that [the defendant] would deal honestly with him." *Id.* at 224, 113 A.2d 136. It is especially significant, in considering the pending post-trial motion, that the *Harper* defendant real-estate agent at the time he made his invitation through the advertisement had no personal knowledge of the plaintiff, and yet this invitation was nonetheless sufficient to create a justifiable trust on the part of the plaintiff.

In *Cohen v. Cohen*, 182 Conn. 193, 438 A.2d 55 (1980), another case on which the *Dunham* court relied, the Connecticut Supreme Court examined the parent-child relationship and explained that "While a relationship between parent and child is not per se a fiduciary one, it does generate a 'natural inclination to repose great confidence and trust.'" *Cohen*, 182 Conn. at 204, 438 A.2d

55 (*citing Hieble v. Hieble,* 164 Conn. 56, 316 A.2d 777 (1972)). There, the plaintiff bought a condominium and took title in the names of the plaintiff and her nineteen-year-old son (the defendant) as joint tenants with the right of survivorship, with the understanding that the son would deed the property back to his mother at her request. The plaintiff arranged for this joint tenancy for two reasons: "her husband had made threats against her life and she feared that he would acquire some interest in the condominium if she died; and the defendant warned her that property held in her name could be reached by his father's creditors." 182 Conn. at 197, 438 A.2d 55. Subsequently, the son claimed that he never agreed to reconvey his interest in the property to his mother. The Connecticut Supreme Court found that on these facts, "[t]he surrounding circumstances support the conclusion that the transfer of a portion of the mother's interest to her son was on the basis of trust and confidence." *Cohen,* 182 Conn. at 204, 438 A.2d 55. "Where that confidence and trust are abused, equity will intervene to remedy the wrong done, although the law would otherwise leave the parties where it finds them." *Cohen,* 182 Conn. at 204, 438 A.2d 55 (*citing Worobey v. Sibieth,* 136 Conn. 352, 71 A.2d 80 (1949)). Similarly, in *Hieble v. Hieble,* 164 Conn. 56, 316 A.2d 777 (1972), the Connecticut Supreme Court explained that the natural inclination to repose trust or confidence that exists in the mother-son relationship, combined with "plaintiff's condition of weakness, her recent surgery, her anticipation of terminal illness, and the defendant's *implicit* reassurances of his faithfulness, this relationship becomes a classic example of the confidentiality to which equity will fasten consequences." *Id.* at 61, 316 A.2d 777 (emphasis added).

It is significant that the Connecticut Supreme Court explained its decision primarily in terms of the nature of the filial relationship, not the defendant's solicitation of trust or existence of any specialized skill or knowledge of the defendant's. The testimony at trial here of the role accorded to the Bridgeport Diocesan Bishop by young Martinelli, whose devout parishioner faith had been developed through church teaching, traditions, rituals and experience, demonstrated a type of relationship from which a reasonable jury could conclude a natural inclination to repose great confidence and trust, a relationship virtually defined by the trust reposed by the parishioner in the Diocese, particularly by the vulnerable child parishioner.[11] Coupled with the Diocese's decision to affirmatively act in the Brett matter by sending Brett away under a ruse and disassociate itself with his victims and past conduct, the jury had an adequate factual basis for its conclusions that a fiduciary duty between the Diocese and this one of its parishioners existed and was breached.

Just as there is no per se fiduciary relationship between a parent and child, see, e.g., *Cooper v. Cavallaro,* 2 Conn.App. 622, 626, 481 A.2d 101 (1984),[12] under Connecticut law, there also is no per se fiduciary relationship between a banker and depositor or lender and borrower. That a relationship is not per se fiduciary in nature does not mean that such a relationship can never be fiduciary in nature; the characterization turns on proof of the circumstances of the relationship. "[G]iven that the 'circumstances which may create a fiduciary relationship are so varied, it is extremely difficult ... to formulate a comprehensive definition of it that would fully and adequately embrace all cases.... The relevant inquiry is whether a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking.'" *Hill v. Bank of South Windsor,* 1996 WL 218677 (Conn.Super.1996) (*quoting Krondes v. Norwalk Savings Society,* 1995 WL 216825 (Conn.Super.1995) (citations omitted)). As the Connecticut Superior Court explained in *Krondes,* "The borrower or party reposing the confidence must be in a position of *inequality, weakness or lack of knowledge*" and lack other access to the

---

11. The Jesuits acknowledge the spiritual vulnerability of youth in the familiar maxim, often attributed to St. Ignatius of Loyola, "Give me a child for the first six years of life and he'll be a servant of God till his last breath."

12. "The relationship between a parent and a child does not per se give rise to the establishment of a fiduciary relationship." *Cooper,* 2 Conn.App. at 626, 481 A.2d 101.

154

necessary information. *Krondes*, 1995 WL 216825 at *4 (citations and internal quotations omitted) (emphasis added).

 The Connecticut Supreme Court has identified several indicia of the fiduciary relationship, many of which are inferable from the evidence presented at the trial of this case. From *Alaimo v. Royer*, 188 Conn. 36, 448 A.2d 207, and *Harper v. Adametz*, 142 Conn. 218, 113 A.2d 136, it is apparent that an explicit invitation to a party to repose trust is a strong factor in identifying the existence of a fiduciary relationship. *Dunham v. Dunham*, 204 Conn. 303, 528 A.2d 1123, *Cohen v. Cohen*, 182 Conn. 193, 438 A.2d 55, and *Hieble v. Hieble*, 164 Conn. 56, 316 A.2d 777, all indicate that relationships that generate a natural inclination to trust, such as brother-brother or parent-child—with or without an explicit invitation to do so—also supply a strong indicium of a fiduciary relationship. In addition, the bank-borrower cases reveal that an otherwise non-fiduciary relationship can become a fiduciary relationship where the party reposing confidence is in a position of weakness or vulnerability. *See Krondes*, 1995 WL 216825 at *4. Here, the indicia of invitation to repose trust (*Alaimo* and *Harper*), relationship generating a natural inclination to trust (*Dunham*, *Cohen* and *Hieble*), and particular vulnerability (*Krondes*) are all characteristics supported by the evidence in this case.

In the case at hand, this court need not and does not decide the circumstances under which other parishioners may be owed a fiduciary duty by their church or Diocese, nor how broad a duty an individual parishioner might be owed.[13] The case as presented is not about whether the Diocese can have or has a fiduciary relationship with all 300,000 parishioners.[14] The case as presented asked the jury a much narrower question as to the facts of this minor, who not only attended a diocesan school, had devoutly and eagerly entrusted his soul and spiritual well-being to his church officials, had a special relationship with a priest arising from diocesan youth programs and activities, but was required by the teachings of the defendant to defer to the wisdom of his Church and its officers. Importantly, this Diocese was in a specialized position to receive and did receive specific information that was of critical importance to the well-being or treatment of a few particular youthful parishioners, and knew rather precisely where to look for the youthful victims whose existence was all but admitted by its priest's acknowledgment of his prior injury-inflicting conduct ("My problem started in Stamford"). In other words, this Diocese had superior knowledge that was not "otherwise readily available" and the plaintiff was in a subordinate position of weakness, inequality and lack of knowledge.

Mr. Martinelli testified that he was taught to trust completely and defer not only to his priest, but also to the Bishop of the Diocese:

Q. What were you taught about the authority of the Bishop of Bridgeport as opposed to civil laws and other people, the pope and anybody else you had to obey?

A. Well, that he—in matters of what was right and wrong, in matters of behavior, the Bishop was the—was the leader, if you will, over us and over the priests. He was the shepherd, we were the flock.

---

13. This court has already declined the opportunity to find a per se fiduciary relationship between parishioners and the Diocese. *See Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 989 F.Supp. 110, 1997 WL 805455 (D.Conn.1997).

14. Even if this case were about all 300,000 parishioners, there certainly are examples of relationships in large institutional contexts in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other, for example, that of the corporation to all shareholders, or pension administrators and beneficiaries. In the institutional context, it is the very fact that there are so many beneficiaries that requires such a relationship. The institutional fiduciary relationship is often character-ized by the fact that those inside the institution (corporate officers, for instance) have information that cannot be known by those on whose behalf they act, or the cost of monitoring is so high as to be inefficient. They are charged by virtue of their institutional character with protecting that trust. *See* Cooter & Freedman, *supra*, at 1049; Anderson, *Conflicts of Interest: Efficiency, Fairness and Corporate Structures*, 25 UCLA L.Rev. 738, 778–80 (1978). This is also true in the context of ERISA plan fiduciaries, who are required by statute to act in the best interests of the beneficiaries of the plan, no matter how numerous those beneficiaries may be. *See* 29 U.S.C. § 1104(a).

Q. Now, was this told you regarding all bishops?

A. I think it was focused on the Bishop of our diocese.

(R. at 915–16). The Diocese not only affirmatively taught the youth of the parish that the Bishop was the "shepherd" and they were the "flock," but also reinforced this lesson with physical manifestations representing the importance of the Bishop's role. As Monsignor Laurence Bronkiewicz, the Episcopal Vicar for the Diocese of Bridgeport explained in his testimony:

Q. And do you know where the word pastoral comes from?

A. It comes from the word pastor which means shepherd.

Q. ... The thing that a bishop carries around with him, what is that called?

A. The crosier.

Q. Yes. That's representative in an assembly for the staff of a shepherd, isn't it?

A. That's right.

Q. And the general idea is that just as a shepherd takes care of his flock, the bishop will take care of the faithful in his diocese, correct?

A. I think that's the concept, yes.

(R. at 183–84).

Mr. Martinelli was also taught by the defendant Diocese that in addition to the Bishop being a sort of caretaker, he was also a moral authority:

Q. What about cases in which—keeping in mind that you were a child at the time, or a young adolescent, can you tell me how you were to make decisions if there was a doubt in your mind as to whether it was sinful or not?

A. We would be expected to obey the priest.

Q. Do you remember if you were told why?

A. It was our duty.

. . . . .

A. If there was a doubt about was what— I was being asked to do wrong or sinful, I was to give the benefit of the doubt to the superior, to assume that they knew what they were doing, and that if it was wrong I would be rewarded for my obedience, they would have to answer for the sin, not me.

(R. at 917–21).

These lessons were reinforced not only in the teachings, but also in the deference accorded to the Bishop by the people around Mr. Martinelli. As the plaintiff testified, things having to do with the Bishop were "a big deal":

Q. When the bishop was going to some down to the parish, was it a big deal?

A. Yeah—yes.

. . . . .

Q. What is meant by when you said it was a big deal when the bishop came down to the parish?

A. Well, I'm thinking of my confirmation and other ceremonies like that. It was just unmistakable that this was someone who was pretty important. He sat in a chair up in the front of the church that was a lot bigger than any of the other chairs that were up there. He sat in the center. He sat down and then everyone else sat down after him. He had a big ring that everyone seemed to kiss. This is also the bishop that decided that girls would not be cheerleaders anymore in our school.... And we also knew that this was the person that had the authority, the power, to ordain priests.

(R. at 984–85). Again, the testimony of Monsignor Bronkiewicz echoed Mr. Martinelli's testimony on the role of the Bishop in the Diocese:

Q. The Bishop is to be the leader in matters of faith and morals in the diocese; is that correct?

A. He's the official teacher of the faith and morals in the diocese.

Q. And to whom does he teach?

A. He teaches the faithful of the diocese.

Q. And that includes parishioners within the diocese, correct?

A. Yes it does.

Q. And as far as you know that's the relationship which would have existed—at least part of the relationship that would have existed in 1962 and '63 between Bish-

op Curtis and the Martinelli family if they were parishioners in the Diocese, right?

A. Right.

(R. at 190). Thus it is not disputed that the defendant overtly encouraged the plaintiff to accept the Bishop as one who had responsibility for his most important asset, his own moral and religious development and spiritual safety. Viewed most favorably to the non-moving party, these lessons can reasonably be construed as invitations to Mr. Martinelli or his family to entrust uniquely or specially in their Bishop of the Diocese the care of Frank Martinelli's faith and morals.

There was also evidence that it was this special trust that resulted in Martinelli's parents entrusting their son to the youth programs sponsored by the Diocese and run by the priests assigned by the Diocese to the particular parish. Mr. Martinelli testified that the fact that his parents allowed him to have a relationship with a priest of the parish indicated their belief in a relationship of trust and confidence between Martinelli as a parishioner and the Bishop of the Diocese:

Q. Did you believe that there was a relationship of trust and confidence between you as a parishioner and the bishop of your diocese?

A. Yes.

Q. And what was the basis of believing that there was a particular relationship of trust and confidence . . . ?

A. Well, what we had been taught from grade school in the catechism classes. The fact that my parents would let me go places with him certainly reflects trust in this person.

(R. at 942). Martinelli also testified that his parents would not have let him go on the trip to Washington, D.C. had it not been chaperoned by a priest of the parish. (R. at 968).

A relationship in which one's well-being, albeit in moral and spiritual matters such as absolution of sins and guidance to a heavenly afterlife, is entrusted is the sort of relationship that generates a natural inclination to repose a great and special trust and confidence on one side, with a resulting superiority on the other.

At least one commentator has urged courts to resist the urge to develop fiduciary law through analogy to the prototypical fiduciary relations, and instead follow an approach in which it is the power relationship and its potential for abuse that is examined. *See* Tamar Frankel, *Fiduciary Law*, 71 Calif. L.Rev. 795, 836 (1983). Guided by this model as well, it is apparent that a party who has critical information available to it by virtue of its position, and yet unavailable to anyone else, that is essential to the safety and well-being of a youth who has been taught to trust absolutely that party in matters touching the soul, has tremendous opportunity to abuse the power relationship as here, by dissembling and nondisclosure. The ability of the beneficiary party (Mr. Martinelli and his family) to monitor the other party's use of that power would be prohibitive, impossible, and quintessentially disrespectful of the Bishop's authority and its divine derivation, as taught to the plaintiff by the defendant.[15]

Returning as a touchstone to the legal standard for Rule 50 motions, a district court may grant a motion for judgment as a matter of law only if there exists "such complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or the evidence in favor of the movant is so overwhelming "that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Cruz*, 34 F.3d at 1154. Examining the evidence the jury had to consider, that the Diocese had been solely entrusted with young victim reports that one of its priests had used his position to inflict criminal injury on very young men and minor boys, that the Diocese had the information that this injury-causing behavior had taken place initially in Stamford, that the Diocese had chosen to act solely by secreting its priest out of state, that the Diocese had sponsored and encouraged Father Brett's ac-

---

**15.** The power relations model theoretically will reduce the costs of preventing abuse, "leaving parties free to allocate the costs between themselves." Frankel, *supra*, at 835. This would suggest that a court should look to who is the "least-cost avoider" in allocating liability for a loss.

tivities and interaction with the youth of the parish, that M.F. was a member of an identifiable, distinguishable and small group of this priest's ardent fans, "Brett's Mavericks," and told the Diocese of his concern about "other boys" in the zone of Brett's danger, that Mr. Martinelli was a student at the diocesan school who participated in church-sponsored activities and spent extracurricular time with Brett, pursuing his religious studies, ironically with the goal of entering the priesthood himself, and that Mr. Martinelli took the diocesan teachings very seriously and actually did repose his infinite trust in the Diocese, the Court concludes that a jury could have found that the Diocese and the plaintiff had a relationship of trust and confidence such that the defendant had a fiduciary duty to investigate or remedy (by warning or otherwise) harm it learned of to minor parishioners or whom it could reasonably have identified as being within a zone of danger from its sexually deviant priest.

In the very recent case of *Smith v. O'Connell,* 997 F.Supp. 226 (D.R.I.1998), the Rhode Island district court rejected a superficially similar claim, finding that the record contained no evidence of a fiduciary relationship between the plaintiffs and the church defendants, and granting summary judgment for the defendant. The two cases are distinguishable in several key respects. Unlike Conn. Gen. Stat. § 52–595, the Rhode Island fraudulent concealment statute in *Smith* requires an "actual misrepresentation," see R.I. Gen. Laws § 9–1–20.

Furthermore, the fiduciary duty asserted here was not premised on mere silence or a failure to inform, and as discussed previously, the record was not barren of evidence on the particularized elements comprising the relationship.[16] While *Smith's* premise is correct that the nature of the fiduciary relationship does not extend to requiring outright admissions of liability for past acts of its priests, this case was tried on the theory that the defendant had a duty to investigate, warn and remedy, in order to prevent *further* damage as a result of past abuse. While *Smith* concluded that disclosures after the abuse

were not required for the sake of disclosure, plaintiff's claim was that the defendant should have sought out the potential victims in order to render assistance and prevent or reduce further damage to untreated victims. The Diocese's experience with M.F.'s family and the documents memorializing that encounter encapsulate the efforts and affirmative decision on the part of the Diocese not to take action of a preventative nature, and implied decision not to act on behalf of other victims. (*See* Pl.'s Ex. Y, Ex. Y–1). The evidence was such that a jury could have found that the M.F. incident demonstrated to the Diocese that Father Brett's misconduct could result in psychological harm to the victims, involving hospitalization and requiring professional therapy, and that victims' parents might claim defendant's liability and seek compensation from the Diocese. Furthermore, a reasonable jury could have found that the language of the M.F. correspondence illustrates the determination of the Diocese to isolate the facts of the M.F. incident such that no persons outside the Diocese hierarchy could have had knowledge of the episode or the defendant's decision not to take any actions to prevent further harm.

### Repressed Memory Evidence and Statute of Limitations

■ Even assuming that the Diocese owed a fiduciary duty to the plaintiff, the Diocese argues that the plaintiff cannot prove that he was ignorant of his right of action, as required by Conn. Gen.Stat. § 52–595. The defendant contends that without proof that the plaintiff's memories of the abuse were repressed, he cannot meet his burden of demonstrating ignorance of his cause of action. However, the plaintiff did testify in essence that the memories of the abuse had been repressed and that they were recalled during a conversation with his friend in 1991. The defendant did not object to such testimony, nor move to exclude it. The defendant nonetheless maintains that in the absence of any expert testimony to establish a foundation for the plaintiff's claim of repressed memory, the plaintiff is not competent to testify as to any repression.

---

16. The *Smith* court, as this Court has done, declined the invitation to find a generalized fiduciary duty between all parishioners and the Catholic church. *See Smith,* 997 F.Supp. at 240.

■ It should be noted that at the Rule 50 stage, the Court reviews the sufficiency of the evidence. A Rule 50 motion is not the appropriate place to argue evidentiary objections that should have been raised at trial. This means that the competency or admissibility of Mr. Martinelli's testimony is not at issue, only the sufficiency. Therefore, the many cases that the defendant cites on the admissibility of repressed memory evidence and the need for expert testimony on such subjects are inapposite. The proper time for such arguments was before or during the trial. Many of these cases, moreover, concern the scientific validity of therapeutic techniques, such as hypnosis, in "recovering" these memories. In contrast, Mr. Martinelli initially recovered his memories without clinical assistance, and in fact, the court would not permit plaintiff's scope of testimony to include his after-acquired lay-understanding about the prevalence of repressed memories of abuse, which he had learned of as part of his more recent efforts to organize a self-help group of clergy-abused people. (R. at 1034.)

■ Mr. Martinelli's testimony was that during a certain period of time, he did not remember the events leading to this case, but that after 1991, he did remember such events.[17] The witness did not testify as to the cause of this lack of memory, nor speculate as to the scientific validity of repressed memories. The jury was free to believe or reject this testimony, as is its exclusive province. On a Rule 50 motion, the evidence is viewed most favorably to the non-movant, without consideration of credibility or weight. See Doctor's Assoc., 92 F.3d at 112.

## Punitive Damages and Proximate Cause

Lastly, the defendant now argues two matters that were not raised in its Rule 50(a) motion: whether there was sufficient evidence to support a punitive damages award, and whether the verdict form adequately provided for a finding that the plaintiff's damages were proximately caused by the defendant.[18]

■ Under Fed.R.Civ.P. 50(a), a party may move for judgment as a matter of law during trial at any time prior to the submission of the case to the jury. Fed.R.Civ.P. 50(a)(2). "The Rule requires the party making such a motion to 'specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.'" Galdieri–Ambrosini, 136 F.3d 276, 286. "After an unfavorable verdict, Rule 50(b) allows the party to 'renew' its motion. The post-trial motion is limited to those grounds that were specifically raised in the prior motion for [JMOL]'; the movant is not permitted to add new grounds after trial." Id. (quoting McCardle v. Haddad, 131 F.3d 43, 51 (2d Cir.1997)) (internal quotations omitted). See also Lambert v. Genesee Hosp., 10 F.3d 46, 53–54 (2d Cir.1993) ("the specificity requirement is obligatory"). The purpose of requiring the moving party to articulate the ground on which the Rule 50 motion is being made "is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him [or her] from taking the case to the jury." Baskin v. Hawley, 807 F.2d 1120, 1134 (2d Cir. 1986) (quotation marks omitted). "The articulation is necessary . . . so that the responding party may seek to correct any overlooked deficiencies in the proof." Galdieri–Ambrosini, 136 F.3d 276, 286 (quoting Fed.R.Civ.P. 50 Advisory Committee Note (1991)). If the motion was not sufficiently specific to alert the opposing party to the supposed deficiencies in his or her proof, judgment as a matter of law may "neither be granted by the district court nor upheld on appeal unless that result is 'required to prevent manifest injustice.'" Id. at 287 (quoting Cruz v. Local

17. As the Appellate Court of Connecticut recounted in Giordano v. Giordano, 39 Conn.App. 183, 664 A.2d 1136 (1995), even the Connecticut legislature was presented with testimony regarding the "unique position of victims of childhood sexual abuse as compared with plaintiffs in other civil cases." Id. at 193, 664 A.2d 1136. The legislative history of Conn. Gen.Stat. § 52–577d shows that the legislature heard from witnesses who testified to the fact that "the nature of the harm sustained by these victims often sublimates their memories of childhood abuse and dims their awareness of the damage until a later date." Id. at 193, 664 A.2d 1136.

18. The defendant has not contested the amount of the damages award, but rather the fact of any damages award at all.

*Union No. 3*, 34 F.3d at 1155). Neither of the arguments that defendant now puts forth was addressed in either its written Rule 50(a) motion or the oral iteration of the motion. The defendant does not here argue that a "manifest injustice" would occur were the Court to let the verdict stand, instead, it argues only that it has met the standard necessary to obtain the entry of a judgment in their favor as a matter of law.

### Punitive Damages

In its argument regarding punitive damages, the defendant claims that none of defendant's actions as claimed by the plaintiff involved misconduct that calls for the imposition of punitive damages.[19] In Connecticut, an award of punitive damages is only appropriate if the evidence reveals "a reckless indifference to the rights of others or an intentional and wanton violation of those rights." *Berry v. Loiseau*, 223 Conn. 786, 614 A.2d 414 (1992) (*quoting Collens v. New Canaan Water Co.*, 155 Conn. 477, 489, 234 A.2d 825 (1967)). "The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the interests of others." *Ames v. Sears, Roebuck, & Co.*, 8 Conn.App. 642, 514 A.2d 352 (1986) (internal quotations marks omitted).

The jury could have reasonably found from the written memorialization of the meeting in which diocesan officials discussed the T.F. incident that not only did diocesan officials know that Father Brett had admitted molesting the two youths who accused him, but that there were other potential victim of Brett's predations (T.F. "was worried about other boys"), Brett discovered "his problem" in Stamford where he was first assigned as a priest, and in light of this information, the Diocese decided to send Father Brett way under a pretense to conceal the real reason for his absence ("A recurrent of hepatitis was to be feigned should anyone ask.") (Pl.'s Ex. Y, Ex. Y–1). From this evidence, the jury could reasonably have inferred that the diocese acted in reckless disregard for the harm that the actions of the Diocese of concealment and containment could cause Brett's victims.

### Proximate Cause

As for the defendant's proximate cause argument, the defendant claims that the jury verdict form inadequately represents a finding of proximate cause on the count of breach of fiduciary duty because the jury specifically found no proximate cause on the count of negligent infliction of emotional distress, (see Interrogatory 7(d), Verdict Form), and this is equivalent to a jury finding that there was no proximate causal connection proved to any damages suffered by plaintiff on the fiduciary duty count. The defendant seems to misunderstand the meaning of interrogatory 7(d), which relates only to one of the required elements for a finding of negligent infliction of emotional distress and not to breach of fiduciary duty. While there was no interrogatory as to proximate cause specifically in relation to the count of breach of fiduciary duty,[20] "[j]uries, however, are presumed to follow the court's instructions," *Greenway v. Buffalo Hilton Hotel*, 951 F.Supp. 1039, 1050 (W.D.N.Y.1997) (*citing Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)), and the Court specifically instructed the jury on the issue of damages that "you must first determine that there is a *causal connection* between the actions of the defendant Diocese and the actual injuries claimed and proved.... The plaintiff, Frank Martinelli, is entitled to be compensated for those damages, if any, that he has proved by a preponderance of the evidence were *proximately caused* by defendant Diocese's unlawful actions." (Jury Instructions (emphasis added)). Other than a conclusory argument, defendant has submitted no specific evidence to support its contention that the jury did not follow the court's instructions on damages.

---

19. The punitive damages portion of the trial was bifurcated, requiring the jury only to determine whether the plaintiff proved the defendant's liability for punitive damages. (*See* Interrogatory 9, Verdict Form).

20. Defendant did not object to the formulation of proximate cause in the jury instructions or on the verdict form.

*See Greenway,* 951 F.Supp. at 1051 (conclusory argument as to jury's actions "insufficient to warrant either a judgment as a matter of law or a new trial"). Accordingly, the jury is presumed to have followed the Court's instructions on the requirement of proximate cause in awarding damages.

■ Furthermore, although the defendant does not cast its argument in terms of an inconsistent verdict, a "court's role is to reconcile and preserve whenever possible a seemingly inconsistent jury verdict." *Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 497 (2d Cir.1995) (*citing Machleder v. Diaz,* 801 F.2d 46, 57 (2d Cir.1986)). This role assigned to the Court is based on the notion that "juries are not bound by what seems inescapable logic to judges." *Id.* (*quoting Morissette v. United States,* 342 U.S. 246, 276, 72 S.Ct. 240, 96 L.Ed. 288 (1952)). In examining the jury's verdict in this case, there are damages that can be said to be caused by a breach of fiduciary duty, but not negligent conduct, particularly in light of the fact that this jury was instructed that "damages may not [be] awarded for the alleged abuse itself, but for the harm that the plaintiff, Frank Martinelli, allegedly experienced as a result of not knowing about his abuse earlier..." (Jury Instructions). On the evidence presented, the jury could have reasonably found that the breach of fiduciary duty was the proximate cause of damages separate and distinct from any damages that could have been caused by any negligent conduct on the part of defendant; specifically, the breach of fiduciary duty, by definition, is a violation of a trust and confidence, encompassing damage associated with the desecration of the relationship itself. In this case, the evidence showed that the plaintiff suffered such damage as loss of his religious faith, loss of his belief in an afterlife, and an inability to trust, damages particularly poignant for one who had once wanted to enter the priesthood, and uniquely related to the disruption of the relationship itself. From the evidence submitted, a reasonable jury could conclude that any negligent conduct by the defendant, on the other hand, resulted only in damages stemming from the abuse itself, which the jury was instructed it could not consider, while the breach of the fiducia-ry relationship, by its very nature, resulted in its own loss—the loss of the relationship itself.

## Conclusion

For the foregoing reasons defendant's post-trial motions [docs. # 167, # 197] are DENIED and the judgment entered based on the jury's verdict will stand.

IT IS SO ORDERED.

## Appendix A

### *Verdict Form*

*Statute of Limitations*

1. In his proof of the existence of a fiduciary relationship between himself and the defendant Diocese, do you find that the plaintiff, Frank Martinelli, proved by a preponderance of the evidence:

a) That he, the plaintiff, reasonably confided in the defendant Diocese as of the date he reached age 21 (August 03, 1968), the type of trust and confidence as described in the Court's instructions?

Yes ‗‗‗‗‗ No ‗‗‗‗‗

b) That the defendant Diocese by its conduct, actually accepted this trust, as described in the Court's instruction?

Yes ‗‗‗‗‗ No ‗‗‗‗‗

c) That the defendant Diocese enjoyed a superior position of knowledge as a result of such trust?

Yes ‗‗‗‗‗ No ‗‗‗‗‗

2. If you have answered "NO" to any part of question No. 1, STOP, you have completed your duties. Please sign and return the verdict form to the court. If you have answered "YES" to all parts of question No. 1, do you find that the defendant Diocese proved by clear and convincing evidence that it acted consistently with its fiduciary duties of loyalty and reasonable care to the plaintiff?

Yes ‗‗‗‗‗ No ‗‗‗‗‗

3. If you have answered "YES" to question No. 2, STOP, you have completed your duties. Please sign and return the verdict form to the court. If you have answered

"NO" to question No. 2, do you find that the defendant Diocese has disproved any one of the required elements of FRAUDULENT CONCEALMENT by clear and convincing evidence?

a) That the plaintiff was not aware of the essential factual elements of his cause of action prior to July 27, 1990?

Yes _____ No _____

b) That the defendant intentionally concealed facts necessary for the plaintiff to know that he had a cause of action, i.e., that he had a legally actionable injury?

Yes _____ No _____

c) That the defendant concealed those facts for the purpose of obtaining delay on the plaintiff's part in filing a complaint on his cause of action?

Yes _____ No _____

4. If you have answered "YES" to any part of question No. 3, STOP, you have completed your duties. Please sign and return the verdict form to the court. If you have answered "NO" to all parts of question No. 3, then you may consider each of the plaintiff's specific legal claims as set forth below.

[OMIT Question 5]

### Count One—BREACH OF FIDUCIARY DUTY

6A. Has the plaintiff, Frank Martinelli, proven by a preponderance of the evidence that there was a fiduciary relationship between himself and the defendant Diocese?

Yes _____ No _____

6B. If you have answered "YES" to question No. 6A, has the defendant Diocese proven by clear and convincing evidence that it acted consistently with its fiduciary duties to the plaintiff?

Yes _____ No _____

### Count Two—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

7. Has the plaintiff, Frank · Martinelli, proven by a preponderance of the evidence each of the required elements of his negligent infliction of emotional distress claim against the defendant Diocese?

a) That the defendant Diocese engaged in negligent conduct which violated a duty of care owed by the defendant to the plaintiff?

Yes _____ No _____

b) That the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress to the plaintiff?

Yes _____ No _____

c) That the defendant should have realized that the emotional distress, if it were caused, might result in illness or bodily harm to the plaintiff?

Yes _____ No _____

d) That the plaintiff suffered emotional distress that was proximately caused by the defendant's conduct?

Yes _____ No _____

### Damages

8. If you have answered "YES" to question No. 6A and "NO" to question No. 6B, or if you have answered "YES" to all parts of question No. 7, to what damages award, if any, is the plaintiff entitled?

$ _____

9. If you have awarded either compensatory or nominal damages in response to question No. 8, do you find that the plaintiff has proved the defendant Diocese's liability for punitive damages?

Yes _____ No _____

_____ _____
Date/Time Signature of Foreperson